PREET BHARARA
United States Attorney for the
Southern District of New York
By: ARASTU K. CHAUDHURY
Assistant United States Attorney
86 Chambers Street, 3rd Floor
New York, New York 10007
Telephone:  (212) 637-2633
Facsimile:  (212) 637-2717
E-mail: arastu.chaudhury@usdoj.gov



FILE COPY

15 MISC 0012

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------x

IN RE:                                    :
                                          :
LETTERS ROGATORY FOR                      :
INTERNATIONAL JUDICIAL                    :
ASSISTANCE FROM THE COURT OF              :
FIRST INSTANCE, REPUBLIC AND              :
CANTON OF GENEVA, SWITZERLAND, :
IN THE MATTER OF AREMISSOFT               :
CORPORATION LIQUIDATING TRUST :
v. LLOYDS TSB BANK PLC                    :
                                          :

-------------------------------------------------x

DECLARATION OF
ARASTU K. CHAUDHURY

M 19-84

I, Arastu K. Chaudhury, pursuant to 28 U.S.C. § 1746, declare as follows:

1.      I am an Assistant United States Attorney in the Office of the United States

Attorney for the Southern District of New York, counsel for the United States of America (the

"Government").  I make this declaration upon information and belief based upon the attached

exhibits and communications with personnel in the United States Department of Justice, to which

a letters rogatory has been transmitted for execution.  I make this declaration in support of the

Government's request, pursuant to 28 U.S.C. § 1782(a),[1] for an order appointing me as a

Commissioner for the purpose of obtaining information from Roys Poyiadjis.  A true and correct

copy of the letters rogatory is attached hereto as Exhibit A.

      2.      In connection with a proceeding captioned "Aremissoft Corporation

Liquidating Trust v. Lloyds TSB Bank PLC," and pending in the Court of First Instance,

Republic and Canton of Geneva, Switzerland (the "Swiss Court"), the Swiss Court issued letters

rogatory seeking information from Roys Poyiadjis located in Washington, D.C.  However, the

U.S. Attorney's Office for the District of Columbia informed this Office that Mr. Poyiadjis now

resides in New York.

      3.      An undated draft of a subpoena addressed to Roys Poyiadjis, 54 East 81st

Street, New York, NY 10028, which the Government intends to serve upon my appointment as

---

[1]  Section 1782(a) provides, in pertinent part, as follows:

> The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal, including criminal investigations conducted before formal accusation.  The order may be made pursuant to a letter rogatory issued, or request made, by a foreign or international tribunal or upon the application of any interested person and may direct that the testimony or statement be given, or the document or other thing be produced, before a person appointed by the court.  By virtue of his appointment, the person appointed has power to administer any necessary oath and take the testimony or statement.  The order may prescribe the practice and procedure, which may be in whole or part the practice and procedure of the foreign country or the international tribunal, for taking the testimony or statement or producing the document or other thing.  To the extent that the order does not prescribe otherwise, the testimony or statement shall be taken, and the document or other thing produced, in accordance with the Federal Rules of Civil Procedure.

Commissioner, is attached hereto as Exhibit B.

4.      To assist the Swiss Court in obtaining the requested information, I respectfully request that this Court appoint me as Commissioner as proposed in the *ex parte* order attached hereto as Exhibit C.  No previous application for the relief sought herein has been made.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

WHEREFORE, the United States respectfully requests that this Court enter the attached Order.

Dated: New York, New York
   January 15, 2015

ARASTU K. CHAUDHURY
Assistant United States Attorney

3

A

PJ28



Republic and canton of Geneva
**JURISDICTION**
Civil Court

ORDER OF

THURSDAY 5 JULY 2012

OTPI/729/2012

Court of First Instance
1 Place du Bourg-de-Four
PO Box 3736
1211 Geneva 3

Ref:.   C/2382312010-16

to be quoted on all correspondence

**Plaintiff(s)**
Aremissoft Corporation Liquidating Trust
Domicile elected: Me Maurice HARARI
100 Rue du Rhône
PO Box 3403
1211 Geneva 3

**Defendant(s)**
Lloyds TSB Bank PLC
Domicile elected: Me Daniel TUNIK 30
Route de Chêne
1211 Geneva 17

On this day, the Court makes the following order:

In view of the proceedings.

In view of the investigations ordered.

Whereas the applicant has requested the hearing of Roys POYIADJIS, domiciled in the United States.

That the dispatch of letters rogatory is justified.

In view of the list of questions and cross-questions lodged in the proceedings by the parties.

In view of the hearing of the submissions of the parties on letters rogatory of the 21 February 2012,

On these grounds,
In view of articles 246 *et seq*. LPC,

THE COURT,
Ruling on a preparatory basis

1.   Issues letters rogatory for the purpose of hearing as a witness:

-   Mr. Roys POYIADJIS
    c/o Bradford A. Berenson
    Sidley Austin Brown & Wood
    1501 K Street, N.W
    Washington, D.C. 2005 (USA)



PJ26

2.  States that the witness Roys POYIADJIS will be asked;

    -   questions 1 to 17 of the AREMISSOFT submissions of the 20 December 2011,

    -   cross-questions **ad question 3 (except for question, 3 c), ad question 4, ad question 7, ad question 11, ad question 14, ad question 15, ad question 17**, contained in the submissions of LLOYDS lodged with the Court on the 27 January 2012,

    -   questions 1 to 9 contained in the submissions of LLOYDS lodged with the Court on the 27 January 2012,.

3.  Asks the requested authority to inform the Court of the date, time and place of execution of the letters rogatory.

4.  Takes formal note that the Counsel for the plaintiff shall be liable for the costs of execution of these letters rogatory.

5.  Reserves examination of the cause until the return of the letters rogatory.

President of the 16th Chamber
(signed)
Paola CAMPOMAGNANI
CALABRESE





This order is communicated for notification to the parties by the court office on   0 3 AOUT 2012

Court of First Instance

1

# SUMMARY OF THE FACTS IN THE CAUSE

AREMISSOFT CORPORATION was an American company active in the development and sale of informatics programs, quoted on the stock exchange, incorporated in the State of Delaware in 1998. It was managed by Lycourgos KYPRIANOU and Roys POYIADJIS.

AREMISSOFT CORPORATION LIQUIDATING TRUST was set up within the framework of the bankruptcy proceedings of AREMISSOFT and was assigned the right to initiate any legal action on behalf of the beneficiaries of the trust in connection with the purchase of AREMISSOFT shares on NASDAQ between April 22, 1999 and July 27, 2001. AREMISSOFT CORPORATION LIQUIDATING TRUST represents not only the bankruptcy assets of the company AREMISSOFT, but also its former shareholders.

At the end of 2000, LLOYDS TSB BANK PLC, Geneva branch (CH), agreed to open several bank accounts at the request of Lycourgos KYPRIANOU and his wife. The cousin of this latter, Evangelos EMBEDOKLIS, was the deputy general manager of the Private Banking department of LLOYDS TSB BANK PLC Geneva branch.

Between December 13, 2000 and February 14, 2001, the personal account of Lycourgos KYPRIANOU at LLOYDS TSB BANK PLC Geneva branch (account "Lady Moura") was credited, in several amounts, for a total of USD 44,296,252.87. According to the explanations provided by Lycourgos KYPRIANOU, these amounts came from the sale of shares in AREMISSOFT CORPORATION.

The funds deposited in LLOYDS TSB BANK PLC were subsequently the subject of transfers onto accounts open in other establishments. All the accounts opened by the spouses KYPRIANOU of which Lycourgos KYPRIANOU was the beneficial owner were closed on October 3, 2002, except for an account which was closed on November 15, 2002.

AREMISSOFT CORPORATION's stock quotation was suspended as from July 30, 2001, the company not having been able to give the stock exchange authorities the necessary accounting information.

Criminal proceedings have been brought in the United States against in particular Lycourgos KYPRIANOU and Roys POYIADJIS, on counts of securities fraud and money laundering. Lycourgos KYPRIANOU however lives in Cyprus.

On October 15, 2010, AREMISSOFT CORPORATION LIQUIDATING TRUST referred a claim for payment to the Court of First Instance of Geneva. It pleaded that LLOYDS TSB BANK PLC should be ordered to pay it the sum of CHF 44,089,676.60 (exchange-value of USD 45,863,493.07) plus interest at 5% from March 1st, 2001.

In substance, the claimant accused the defendant of being guilty of various unlawful acts, that is money laundering, forgery of documents, and even of participation in a fraud.

According to it, the acts committed by Lycourgos KYPRIANOU and Roys POYIADJIS in the United States met the conditions of fraud and mismanagement. Lycourgos KYPRIANOU deceived the market and all the shareholders of AREMISSOFT CORPORATION through the establishment and publication of inaccurate accounts, as well as by giving false information to the public, in particular by means of advertisements or press releases to the SEC.

However, still according to the claimant, the defendant could not be unaware that the origin of the funds paid into the accounts opened by the spouses KYPRIANOU was criminal. The bank had in addition agreed to carry out numerous transactions to the debit and credit of the various accounts after the accusations of the AREMISSOFT fraud in the international press and even after Lycourgos KYPRIANOU had been indicted.

The claimant considers that the damage caused by the behavior of the management bodies and/or employees of the defendant corresponds at least to the amount of the assets which had circulated within the establishment.

The defendant for its part disputes any liability and claims that its employees complied with their obligations of diligence and that they had no intention of laundering the proceeds of a crime.

The defendant consequently pleads that the claimant should be nonsuited of all its pleadings.



Questions from AREMISSOFT CORPORATION LIQUIDATING TRUST OF 20.10.2011

QUESTIONS to Mr. ROYS POYIADJIS

**Question 1:**
What was your position in AremisSoft from 1999 to 2001?

**Question 2:**
Are you aware of the allegations of fraud involving AremisSoft?

**Question 3:**
Did you take part in the fraudulent activities involving AremisSoft? If so, have you been sentenced for these actions?

**On exhibit 26, defendant's schedule:**

**Question 4:**
Are you aware that LLOYDS TSB BANK plc in Geneva (hereinafter, "Lloyds") had confirmed that an amount of USD 9,980,000 was blocked in favor of AremisSoft EE.ME.A on December 29, 2000?

**Question 5:**
What percentage did this amount of USD 9,980,000 represent in relation to the total cash appearing on the balance sheet of AremisSoft, on a consolidated basis, at December 31, 2000?

**Question 6:**
Where did this amount of USD 9,980,000 come from?

**Question 7:**
When and how was this amount determined?

**Question 8:**
What was the reason that led to the allocation of this amount to AremisSoft EEMEA?

**Question 9:**
What would have happened if AremisSoft had not included this USD 9,980,000 as cash in its financial statements?

**Question 10:**
Why was the confirmation of March 20, 2001 prepared?

**Question 11:**
Who gave Lloyds the instruction to prepare it?



**Question 12:**
What would the consequences have been if AremisSoft had not been able to produce such a confirmation?

**Question 13**
Were you still involved with AremisSoft in June 2001?

**On exhibits 15 and 17, defendant's schedule:**

**Question 14**
Why did Lloyds issue two previous certificates dated respectively December 29, 2000 and February 7, 2001?

**On exhibit 44, plaintiff's schedule:**

**Question 15:**
Why was an account in the name of AremisSoft EE.ME.A opened at Lloyds at this time?

**Question 16:**
What happened with the account opened in the name of AremisSoft EE.ME.A at Lloyds?

**Question 17:**
Did Lloyds carry out any checks before opening the account in the name of AremisSoft EE.ME.A?



COURT OF FIRST INSTANCE
Cause C/123823/2010-16

of May 11, 2012
Account AO 1194

PJ26

---

## SCHEDULE OF EXHIBITS

for

AREMISSOFT CORPORATION LIQUIDATING TRUST

Plaintiff

Me Maurice HARARI

v.

LLOYDS TSB BANK PLC

Defendant

Me Daniel Tunik

---

*Exhibit 1* Exhibit 26 of the defendant's schedule

*Exhibit 2* Exhibit 15 of the defendant's schedule

*Exhibit 3* Exhibit 17 of the defendant's schedule

*Exhibit 4* Exhibit 44 of the plaintiff's schedule

Certified true and correct
translation.
Geneva,    JUL 2 6 2012



 **Lloyds TSB**

Lloyds TSB Bank plc
Geneva Branch
Place Bel-Air 1
Case postale 5145
CH 1211 Genève 11

Telephone + 41 22/307 33 33
Fax          + 41 22/307 34 24

Direct Tel. + 41 22/307
Direct Fax + 41 22/307

**International Private Banking**



TO WHOM IT MAY CONCERN:

*[handwritten: 357 - 2 - 876 334 MELETIOU*
*ATTN: Pavlos Meletiou*
*Savvides & Partners*
*SAVVIDES]*

# ATTESTATION

We, the undersigned, representing Lloyds TSB Bank plc, Geneva branch, hereby confirm that we hold an amount of USD 9'980'000 (US Dollars Nine Million Nine Hundred and Eighty Thousand) blocked in favour of AremisSoft (EE,ME,A) Ltd.

Yours faithfully,

LLOYDS TSB BANK PLC

Jane Moore
Assistant Manager

Michel Grossenbacher
Signing Officer

Geneva, 29th December 2000

Registered in England No. 2065 - Registered office: 71, Lombard Street, London EC3P 3BS



Lloyds TSB Bank plc
Geneva Branch
Place Bel-Air 1
Case postale 5145
CH 1211 Genève 11

Telephone + 41 22/307 33 33
Fax       + 41 22/307 34 24

Direct Tel. + 41 22/307
Direct Fax + 41 22/307

International Private Banking

Concerne : Lady Moura
19.80 410

TO WHOM IT MAY CONCERN:

# ATTESTATION

We, the undersigned, representing Lloyds TSB Bank plc, Geneva branch, hereby confirm that we hold an amount of USD 9'980'000 (US Dollars Nine Million Nine Hundred and Eighty Thousand) blocked in favour of AremisSoft (EE,ME,A) Ltd. as from this day, the 7th of February 2001, until further notice.

Yours faithfully,

LLOYDS TSB BANK PLC

Jane Moore
Manager

Sylvie Orsatti
Assistant Manager

Geneva, 7th February 2001

Jane Moore

"It was agreed with the client, that only upon receipt of the original of this attestation, we will unblock the account." (see SPSA)

Registered in England No. 2065 - Registered office: 71, Lombard Street, London EC3P 3BS



## Lloyds TSB

Lloyds TSB Bank plc
Geneva Branch
Place Bel-Air 1
Case postale 5145
CH 1211 Genève 11

Telephone + 41 22/307 33 33
Fax       + 41 22/307 34 24

Direct Tel. + 41 22/307
Direct Fax + 41 22/307

**International Private Banking**

Mr. Pavlos Meletiou
Sayvides & Partners
2, Andreas Zakos Str., Engomi
P.O.Box 28584
2080 Nicosia, Cyprus

## CONFIRMATION

MOORE
M 692
6/4/01

We, the undersigned, representing Lloyds TSB Bank plc, Geneva branch, hereby confirm that since the 29th of December 2000, we hold an amount of USD 9'980'000 (US Dollars Nine Million Nine Hundred and Eighty Thousand) blocked in favour of AremisSoft (EE,ME,A) Ltd. This amount is blocked in our books until further notice.

Yours faithfully,

LLOYDS TSB BANK PLC

Jane Moore
Manager

Sylvie Orsatti
Assistant Manager

Geneva, 20th March 2001



Lovells

March 6, 2007

Direct line 212-909-0643                         Our ref NYLJF/114627.1
marc.gottridge@lovells.com                       Matter ref 0143L/01670

Ronald D. Lefton, Esq.                           By courier
Greenberg Traurig LLP
Met Life Building
200 Park Avenue
New York, NY 10166

Re:   *Request on behalf of the Trustees of the AremisSoft Liquidating Trust*

Dear Ron:

As requested by the Trustees, we enclose copies of documents held by Lloyds TSB Bank plc ("Lloyds TSB") in connection with the account formerly held by the Cypriot company AremisSoft (EE.ME.A) Ltd. at Lloyds TSB's Geneva branch.  These documents have been Bates-stamped LTSB001 through LTSB072.

Very truly yours,

Marc J. Gottridge

cc:  Mr. Beat Kunz

Alicante  Amsterdam  Beijing  Berlin  Brussels  Chicago  Dusseldorf  Frankfurt  Hamburg  Ho Chi Minh City  Hong Kong  London  Madrid  Milan
Moscow  Munich  New York  Paris  Prague  Rome  Shanghai  Singapore  Tokyo  Warsaw  Associated offices: Budapest  Zagreb

Lawyers (USA)  Solicitors  Rechtsanwälte  Avocats  Advocaten  Notarissen  Avvocati  Abogados

# Lloyds TSB



## Application

# for opening of an account

# and general conditions

Geneva



# IMPORTANT NOTICE

By signing this application to open an account the Customer confirms having read in totality, examined and approved without reservation the General Conditions herein, which form an integral part of the contractual relationships which bind the parties.

In particular the Customer's attention has been drawn to the paragraphs printed in bold characters as well as certain paragraphs assigning specific authorities to the Bank, for which the Customer's signature must additionally be affixed in the margin of each relevant article; the following are those articles to which the Customer's express agreement is given in addition to the general acceptance of the General Conditions:

1.  Power of attorney relating to fiduciary deposits abroad and money market funds (Art. 2).

2.  Management authority for securities with postponed printing of certificates (Art. 3, para. 4).

3.  Proxy for general meetings (Art. 3, para. 7).

Should any one of the above-mentioned clauses not be signed by the Customer as accepted, then such clauses will not be binding on the Customer's or the Bank's behalf.

On the other hand, all other clauses will be deemed to be accepted by the Customer, as soon as the latter has signed the application to open an account.

This document is a translation, in case of dispute, the French or German versions of this agreement which are held at your disposal, will be applicable.



# APPLICATION TO OPEN AN ACCOUNT

I/we the undersigned apply to open an account with Lloyds TSB Bank plc [hereinafter "*the Bank*"]. The relationship between *the Bank* and me/us [hereinafter "*the customer*"] are governed by the

## GENERAL CONDITIONS

the text of which follows below and which will be applicable thereto in the absence of any agreement of derogation or specific banking practices:

Article 1: Current and other accounts

1.   *The Bank* undertakes to maintain accounts in freely negotiable currencies of its choice. It credits and debits interest and agreed or normal commissions and charges, also taxes, quarterly, semi-annually or annually, as it may decide.

2.   Conditions applicable to certain types of account, particularly those referring to withdrawals and notice required therefore, are subject to changes which will be notified to *the customer* by all appropriate means, as will interest rates and commissions in the case of fluctuations on the money market.

3.   In the case of various instructions from *the customer* involving a total which exceeds the available amount or any credit granted, *the Bank* is authorised to establish at its discretion which instructions are to be carried out, without reference to the date which they bear or on which they were received. It is expressly authorised, if it considers it preferable, to carry out all *the customer's* instructions, even if the account is thereby put in debit.

4.   Funds received in a currency for which no account is held will be converted and credited to the Swiss Franc or another account which may exist or may be held in the currency which is received, as *the Bank* may judge preferable. If instructions are received for transfers or payments in a currency for which no account exists, *the Bank* may, in the absence of precise instructions, carry them out by debiting any account, as it may judge preferable.

5.   The word "francs" which may figure in *the Bank's* correspondence with its customers refers, unless specified otherwise, to Swiss Francs:

6.   If withdrawal from a deposit account has not been effected within two weeks after the expiry of the notice given, the latter is considered cancelled and the amount in question is not entitled to interest for those two weeks.

7.   The counterpart of customers' holdings in foreign currencies is deposited in the same currency, in or outside the relative domicile of the currency in question, with *the Bank's* correspondents. Any official regulations or restrictions which may affect the assets of *the Bank* in the country where the currency is domiciled or where the assets are deposited equally affect the assets of *the customer*.

*The customer* may dispose of his assets in foreign currencies by means of payment orders or the purchase of cheques in the currency of the account; other methods require the consent of *the Bank*. For cash deposits or withdrawals in foreign currencies *the Bank* charges a commission.

8.   A customer to whom *the Bank* has issued cheque forms undertakes to conform to the conditions for their use which accompany them and to advise *the Bank* immediately in the case of their being lost or stolen, *the customer* being liable for any prejudice or loss resulting therefrom. *The customer* is also liable for the consequences of a missing or unclear designation of the currency on the cheque.

When the account is closed *the customer* must return all unused cheque forms to *the Bank*. A customer may only draw a cheque on *the Bank* if he has the required amount on his account.

9.   If bills of exchange, cheques or other instruments that are presented for collection or that have been discounted are not paid or the product is not freely available, *the Bank* may debit the relative amounts credited while retaining until any such debt is discharged, all the rights based on the instruments in question.

## Article 2: Power of administration for fiduciary deposits abroad and money market funds

1. *The customer* authorises *the Bank* to use all or part of the funds held by it to make, as it judges best, fiduciary deposits abroad. Those deposits are made by *the Bank*, in its own name, but at *the customer's* risk, with branches or subsidiaries of Lloyds TSB Bank plc or other banks abroad, in the currency and at conditions which *the Bank* may regard as favourable.

2. *The Bank* is not obliged to use its Power and *the customer* has the right to give specific instructions to *the Bank* regarding any such deposits.

3. The currency, the amount, the debtor and conditions for each deposit are fixed either by *the Bank* as it sees fit, or by *the customer* when the latter defines them in a special instruction. Any instruction regarding existing deposits must reach *the Bank* at least five working days before the date of maturity, failing which *the Bank* will decide at its discretion on the need for an eventual renewal or a new deposit.

4. *The customer* puts the necessary funds at the disposal of *the Bank* before any fiduciary operation and authorises *the Bank* to debit the relative amounts to the account. These amounts will be booked in a "fiduciary account" and the resulting interest credited to *the customer's* account.

5. *The customer* can cancel this Power of Administration at any time without, however, such cancellation affecting any current operations, in respect of which *the Bank* will act in *the customer's* best interests until the expiry of the contracts. In the absence of any cancellation this Power of Administration maintains its validity even in the case of the death, legal incapacity or bankruptcy of *the customer*.

6. *The Bank's* sole obligation is to transfer to *the customer* sums becoming available from repayment of capital and payment of interest. If the institution abroad does not meet its obligations wholly or in part, *the Bank* is released by ceding to *the customer* the claims it holds on his behalf. *The Bank* is not bound to perform any other duties in this respect. *The customer* discharges *the Bank* from any responsibility in connection with any operations *the Bank* may be called to undertake under this Power of Administration.

7. *The customer* undertakes to pay to *the Bank* the usual commission applicable at the moment of the operation, this to be calculated on the basis of the amounts deposited with institutions abroad and to be charged without reference to interest payments.

8. Instead of fiduciary deposits, *the Bank* is authorised, if it so chooses, to take all or part of the funds in current account and place them in investment funds managed by the Lloyds TSB Bank p c the object of which is to make investments in short-term instruments in the money market and/or in inter-bank deposits.

## Article 3: Deposit of securities

1. *The Bank* undertakes to keep in custody all securities in open deposit, in a secure place, with the same care as for the securities it holds for its own account.

2. *The Bank* is, however, authorised to deposit the securities with its correspondents in Switzerland or abroad, in its own name but at the risk and peril of *the customer*; in this case the securities are administered by the correspondent in accordance with the customs and laws of the place of safe-keeping, *the Bank's* charges being subject to increases resulting from the commissions and expenses of its correspondents.

3. If *the customer* does not insist on his securities being held separately, and in that case accepts the relative charges, *the Bank* is expressly authorised to hold them in a general deposit for each category of security without listing the individual securities as belonging specifically to *the customer*, or to deposit them in a collective deposit centre; in this case *the customer* has right of co-ownership proportional to the number of securities in the category in question which *the Bank* has registered in *the customer's* name. An exception is made to this rule in the case of securities which are registered in the name of a customer or for any other reason have to be held separately. When securities in collective deposit are the subject of a drawing by lot *the Bank* allots the securities drawn by making a secondary drawing in such a way as to guarantee equal chances to all those qualified.

-- 4 --



4. *The Bank* also administers investments in the money and capital markets which are not represented by a certificate (in particular registered shares with postponed printing of certificates) and books them in open deposit. In the case where the printing of certificates is postponed, *the Bank* is authorised to request the issuing company to convert any existing securities held into registered rights that are not incorporated into a certificate and upon *the customer's* request to demand, at any time, as far as possible, that the issuing company prints and delivers the security certificates. For those securities for which certificates are only printed on application *the Bank* carries out all the necessary administrative procedures and gives all relevant instructions to the issuing company. This Power of Administration does not expire with the death, loss of civil rights or bankruptcy of *the customer*.

5. *The Bank* undertakes the usual administrative operations relating to securities it holds in open deposit, including presentation of coupons and receipt of dividends, drawings by lot, final or premature repayments etc. In addition, but without obligation, *the Bank* encourages *the customer* to protect his own interests by exercising his rights of subscription, conversion and option. In default of instructions, *the Bank* has the right to act according to its own judgement in the best interests of *the customer* without responsibility on its part.

6. *The Bank* guides its customers in the choice of investments and considers with them improvements which may be made as to the composition of their portfolios. At the request of *the customer* the Bank will undertake the full and discretionary management of a portfolio on the basis of a Management Authority to be signed separately.

7. *The customer* expressly authorises *the Bank*, with the right of substitution, to represent *the customer's* securities at shareholders' general meetings, without it being obliged to do so. This authority does not expire with the death, loss of civil rights or bankruptcy of *the customer*. *The Bank* undertakes to inform *the customer*, unless they have already been reported in the press, of any particularly important items on the agenda. In other cases it will vote in favour of the proposals of the Board of Directors. *The customer* can at any time request the right to vote personally, provided eight days notice is given.



8. The deposit is made for an unlimited period. *The customer* can require its return at any time. Such return will take place as soon as *the Bank* receives the securities from its correspondents. *The Bank* can at any time demand, without giving reasons, the withdrawal of the deposit.

9. Purchases and sales of securities are carried out according to the customs of the place where they are made. Orders subject to cancellation or those unlimited in time which have not been carried out by the end of the month following that during which they were given, are automatically null and void.

## Article 4: Deposit of precious metals and coins

1. *The Bank* administers collective deposits of precious metals and gold coins which do not have a special numismatic value. On behalf of the owners of collective deposits, *the Bank* holds precious metals having at least the minimum alloy value in commercial use in an amount equal to that of *the customer's* holdings, in Switzerland or abroad, at its premises or with third parties. In the latter case such deposits with third parties are made in *the Bank's* name but for the account of, and at the risk of, *the customer*. Each customer is co-owner of the collective deposit in proportion to the participation of each one therein.

2. Assets in precious metals are booked by *the Bank* in function of either the number of fungible units, such as ingots, or the fine weight.

3. *The customer* can at any time withdraw and have delivered to him the quantity of precious metal equivalent to his portion held in the collective deposit. In default of any other agreement the place of execution is *the Bank*. All expenses and risks arising from delivery elsewhere are to be borne by *the customer*.

4. The metal delivered corresponds to the number of fungible units booked. In the case of deposits expressed in units of fine weight, *the Bank* is authorised to deliver ingots of any weight having at least the minimum alloy value in commercial use and to invoice the cost of making the ingots. Any difference in weight which may still arise can be made good, at the choice of *the Bank*, by additional small fungible units or by cash based on the price of the precious metal at the appropriate stock exchange at the moment the transaction advice is issued. *The Bank* must be given one week's notice for large withdrawals.

– 5 –

6. There are special reservations regarding cases where *the customer* requires his assets to be a separate individual deposit and will bear the eventual additional costs. In addition where closed items (parcels, envelopes, etc.) are deposited with *the Bank*, they must be sealed in such a way that it is impossible to open them without breaking the seal. They must not contain objects which are dangerous or which are not suitable to be held by *the Bank* which is only responsible for any damage resulting from its own fault and proved so to be by *the customer* and then only to the extent of the value declared by *the customer* when the object was deposited. In all cases, *the Bank* is not responsible for any damage due to atmospheric conditions. Safe custody charges will be fixed in each case according to the nature and value of the objects held. When the object is withdrawn from deposit, any eventual damage to the seal or the package must be reported immediately. The receipt signed by *the customer* relieves *the Bank* definitively of all responsibility.

## Article 5: Payment for the Bank's Services

The services rendered by *the Bank* are paid for according to the tariffs it lays down. In particular *the Bank* is authorised to debit safe custody charges, commissions and usual charges.

## Article 6: Signatures

1. Only those signatures communicated in writing to *the Bank* are valid for dealings until written notification of revocation, *the Bank* not being bound by official registrations or publications which may differ. When several people are authorised to sign, precise indications must be given as to whether each signature is valid individually or if several signatures together are required. In default of any such indication *the Bank* considers that each person whose signature is on the signature card is authorised to sign alone.

2. Should, however, at any time, as a result of death, cancellation, revocation, resignation or any other reason, a signatory with a collective signature remain the only person whose signature remains on the signature card then this signature will be sufficient in all cases to give a valid discharge to *the Bank*.

3. *The Bank* verifies the authenticity of the signatures in the usual way, that is by comparing signatures presented to *the Bank* with those deposited on the signature cards. *The Bank* accepts no responsibility for any loss which may result from forgery or mistakes which a normal verification could not be expected to reveal.

4. Any loss resulting from the legal incapacity of a customer or a third party is *the customer's* responsibility unless notice thereof has already been given in writing to *the Bank*.

## Article 7: Instructions given by telephone, telex and telefax

1. *The Bank* accepts instructions by telephone from *the customer* and carries them out without awaiting written confirmation, which in certain cases will not be given. *The customer* accepts the risks inherent in this procedure, particularly those which may result from a mistake in transmission or comprehension, or mutilation or duplication of instructions. *The customer* discharges *the Bank* in advance from any responsibility for any problem which may result from this procedure. The same applies to instructions which *the Bank* may receive by non-tested telex or by telefax, but *the Bank* reserves the right to refuse to accept these means of communication.

2. *The Bank* may, without being obliged to, demand any necessary details needed to identify the person who telephones, but in no case can *the Bank* be held responsible in the case of an unauthorised person making improper use of this procedure. Any falsification of identity is the sole liability of *the customer*. This procedure is opposable by *the Bank* in relation to a customer or a customer's authorised representative, whether the message has been transmitted by telephone, telex or telefax.

— 6 —

3. *The customer* undertakes to accept all operations executed in this way by the d.
*customer's* account and to provide the cover necessary for any debit balance which m...
therefrom.

4. This procedure is valid until written cancellation thereof by *the customer* or, if relevant, *the customer's* heirs.

5. *The customer* accepts that *the Bank* reserves the right to decide, at any time, to record tele-
phone conversations held between *the Bank* and *the customer* or *the customer's* legal representative
regardless which party initiated the call, the sole purpose being to verify the accuracy of instructions
given to *the Bank*. In the case of dispute *the customer* will of course be able to listen to these
recordings. *The Bank* will take all necessary measures to ensure the confidentiality of such recordings.


## Article 8:  Communications with the Bank

1. Communications from *the Bank* are deemed to be effected as soon as they are sent to the last address
indicated by *the customer*. The date on the copy held by *the Bank* is deemed to be the date of despatch.

2. *The Bank* sends statements of their assets to customers from time to time. If *the customer* has not
notified any objection within four weeks of despatch the statement is deemed to be accepted as correct.
The tacit or stated acceptance of a balance implies the approval of all the items figuring on the
statement during the period it covers as well as of any reservations of *the Bank*.

3. If *the customer* instructs *the Bank* to hold all correspondence, it is unconditionally deemed to have
been delivered at the date indicated on each item of correspondence. All risks which may result from this
arrangement including the risk of late claims are assumed by *the customer* who has a duty to call regularly
and collect the correspondence held by *the Bank* and who, at any time, will be requested to sign and return
conformity statements of the balance of his accounts unless this has already been done within the previous
six months. In the absence of any other agreement, *the Bank* is authorised, but not obliged, to take any
steps it considers appropriate with regard to correspondence it may receive for account of *the customer*, in
order to protect his interest. *The Bank* is expressly discharged of any responsibility and it is authorised to
destroy correspondence held under this arrangement after three years.

4. If an account is opened and maintained under a code or number, on the sole instructions, and at the
risk and peril of *the customer*, correspondence referring thereto will be deemed to have been sent to *the
customer* as if it had been addressed to *the customer* by name.


## Article 9:  Pledge and Right of Set-off

1. By signing these General Conditions *the customer* assigns and pledges to *the Bank* in confor-
mity with the law and the following conditions, as a guarantee for any claims present or future
which *the Bank* may have against *the customer* in the course of their banking relationships, all
assets entrusted to it in any type of account, either at its premises or at its head office or other
branches, or held for *the customer's* account in *the Bank's* name at any other place.

2. The assets thus pledged and assigned comprise all *the customer's* assets entrusted to *the Bank*,
such as for example, precious metals, securities, shares, certificates of claims and participations,
claims resulting from non-individualised deposits, all other claims, fiduciary deposits, assets in
Swiss Francs as well as in foreign currencies or their counter-value in Swiss Francs deposited
with *the Bank* or in its name with third parties, including interest, dividends and other rights,
matured or not.

3. In the case of changes in the composition of *the customer's* assets, the new items are automati-
cally covered, in the place of the previous ones, by this pledge which comes into force automati-
cally each time *the Bank* has a claim against *the customer*. *The customer* further undertakes to
collaborate in the transfer of the pledged assets by carrying out, where necessary, endorsements
and assignments required for the transfer. *The Bank* has the right at all times to have handed over
to it assets pledged in its favour but held by third parties.

4.    If the value of the pledged assets falls below the agreed or usual margin, *the customer* is required, with two weeks' notice, either to reduce the amount of the debt outstanding or to provide additional security. If this is not done within the time limit granted, or in the case where it were impossible for *the Bank*, for exceptional reasons, to inform him of such a situation, the whole amount of the debt becomes payable immediately.

5.    If the claim does thus become payable, *the Bank* is authorised to realise all or part of the assets pledged without any other notice and without following the prescribed legal procedure, and in the way, manner or order and within a time-scale which it may decide, through a Stock Exchange or over-the-counter, such assets having been duly assigned to *the Bank* by the signature of these General Conditions, any uncovered debit balance remaining a liability of *the customer*.

6.    Notwithstanding this pledge in favour of *the Bank*, it is *the customer's* own duty to supervise all operations such as drawings by lot, final or premature repayments and others, unless *the Bank* finds it necessary, and chooses to carry out this supervision itself for its own protection.

7.    *The Bank* also has the right at any time to set-off assets between *the customer's* accounts, held under whatever account or type of account and in whatever currency they may be named; but it also reserves the right to consider each balance separately.

## Article 10:   Options and forward operations

1.    In the case of forward dealing in precious metals, currencies, raw materials and securities and of all types of options which *the Bank* may be required to carry out on the instructions of *the customer*, the latter confirms being fully aware of the high degree of risk in such investments and undertakes to provide to *the Bank* the margins which it may at its discretion demand.

2.    Such a margin corresponds to a certain percentage, fixed by *the Bank*, of the amount involved in the operation. *The Bank* is authorised to modify this percentage at any time without notice. It also has the right to demand additional security if the value of the margin has diminished.

3.    If *the customer* does not give effect to the margin calls within the time limit set, *the Bank* may, at its choice, either debit *the customer* or close out, without further notice, all or part of the current positions, even if this results in a loss for *the customer*.

4.    If the margin proves insufficient to cover such a loss, *the Bank* is authorised, but not obliged, to realise immediately and without notice all or part of *the customer's* assets.

5.    The assets used to cover the margin are considered to be pledged as security to *the Bank*. In addition the terms of Article 9 are applicable.

## Article 11:   Special Conditions

1.    *The Bank* does not assume any responsibility for any loss resulting from the use of postal services, telegrams, telephone, telex, telefax or any other means of transmission or of a transport company. In particular *the customer* is responsible, except in the case of gross negligence on the part of *the Bank*, for all losses resulting from mistakes, delays, losses, misunderstandings, mutilations or duplicated despatches.

2.    If a loss is due to the non-execution or delayed execution of an instruction which is the fault of *the Bank*, the latter will only accept liability for loss of interest unless, in a particular case, it has been warned in writing of the risk of a greater loss. This condition does not refer to stock exchange orders.

3.    *The Bank* is not obliged to accept funds which reach it with an inexact or incomplete denomination of the account to be credited. It can, at its discretion, return or accept them and does not assume, in either case, any responsibility.

4.    Any claim by *the customer* regarding any action of *the Bank* must be presented on receipt of the relevant advices and at the latest within four weeks. In default of any claim, advices and communications are deemed to be approved. If *the customer* does not receive an advice which may be expected from *the Bank*, then *the customer* must make a claim at the moment when such an advice should normally have been received. *The customer* is liable for any loss resulting from a delay in claiming.

— 8 —

5.   In all relations between *the Bank* and *the customer* Saturday is deemed to be a public holiday.

6.   *The Bank* has the right at any time to end its relationship with *the customer* and in particular to cancel credit lines promised, granted or used, in which case the repayment of any claim will become due within the time limit fixed by *the Bank*.

7.   *The Bank* reserves the right to modify these General Conditions at any time.  Such modification will be notified to *the customer* by all appropriate means.  In default of any contestation within four weeks they will be deemed to be approved.

### Article 12:   Complementary Conditions

1.   In addition to these General Conditions, which apply automatically to all relations between *the customer* and *the Bank*, certain spheres of activity are governed by special conditions.  This is the case notably for powers of administration, powers of attorney, joint accounts, rental of private safes.

2.   Furthermore stock exchange and foreign exchange operations are subject to the customs of the market where they take place.  Documentary credits are governed by the Uniform Customs and Practices of the International Chamber of Commerce.  Collections and discount operations are governed by the General Conditions of the Swiss Bankers' Association.

### Article 13:   Applicable law and jurisdiction

All relations between *the customer* and *the Bank* are governed by Swiss law.  The place of business of the branch of *the Bank* which is in relationship with *the customer* is the place of performance, the place for special proceedings for the collection of debts owed by customers domiciled abroad, and the place for all proceedings.  *The Bank* nevertheless retains the right to bring proceedings to the domicile of *the customer* or before any other competent authority, in which case Swiss law shall remain applicable.



# Account Holder(s)

①

X Surname(s) / Registered name

AREMISSOFT (EEMEA) LIMITED

X Forename(s) / Type of Company

LIMITED LIABILITY

X Nationality(ies) / Registered Office

103 STROVOLOS AVENUE
STROVOLOS NICOSIA
CYPRUS

X Profession(s) / Main activity

TO STUDY, DESIGN, AND
IMPLEMENT SOFTWARE SYSTEM

X Place(s) and date(s) of birth / Date of Incorporation

13 TH DECEMBER 1999

Marital status(i)

X Legal address / Corporate address

103 STROVOLOS AVENUE
STROVOLOS NICOSIA
CYPRUS

X Address for mail

P.O.BOX 28300
1099 NICOSIA
CYPRUS

☐ All communications to be held, by the Bank, subject
to Article 8 of the General Conditions

Telephone Numbers : Private 00357.2.495811    Professional 00357.2.495811

Telex Number(s) ...............................   Telefax Number(s) 00357.2.495078

Identity document(s) / Corporate documents produced ...............................

...............................

...............................

...............................

Relerences ...............................

LTSB007



H°. 0641   P. 5

# Opening of an account

(2)

| | | | |
|---|---|---|---|
| Type | [X] Nominative | Signing Powers | [X] Individual |
| | [ ] Mail Code | | [ ] Joint (individual signatures) |
| | | | [ ] Collective: any ................. |
| Currency(ies) | [ ] Swiss Francs | | [ ] Euro |
| | [X] US Dollars | | [ ] ................. |
| | [ ] Pounds Sterling | | [ ] ................. |
| Correspondence in | [X] English | [ ] French | [ ] German |

Special Instructions .............................................................

...............................................................................

...............................................................................

The undersigned account holder(s) accept(s) without reservation the above-mentioned General Conditions.

Date and place ..Nicosia,  7 June 2001..........................

Signature(s) of the account holder(s)

Please also sign in margins on page 4 and 5.

Name of Account  *ARCUS FE (EE, ME, A) LIMITED*

Bank number  *192.551*          Account(s) number(s)  *110*

Base and performance
currency (in letters)  *USD*

Account executive code  *699*

Name and signature of the account executive

MOORE J.
M 699

EMBEDOKUS E.
E 114

LTSB008



'09:17  100      5        ID=          '4   :41

## Lloyds TSB



# A

Lloyds TSB Bank plc
Geneva Branch

N° du compte/dépôt / Account No./Deposit                 Cocontractant / Contracting partner

190551 AREMISSOFT (EE, ME, A) LIMITED

## Identification de l'ayant droit économique
(Formulaire A selon art. 3 et 4 CDB)

### Establishment of the Beneficial Owner's Identity
(Form A as per Art. 3 and 4 CDB)

Le/la soussigné(e) déclare (indiquez par une croix ce qui convient):
*The undersigned hereby declares (mark with a cross where appropriate):*

☐ que le cocontractant est l'ayant droit économique des valeurs patrimoniales,
*that the contracting partner is the beneficial owner of the assets concerned.*

☒ que l'ayant droit économique des valeurs patrimoniales est:
*that the beneficial owner of the assets concerned is:*

Nom, Prénom (ou raison sociale) / Full name (or firm)  Adresse/Siège, Etat / Address/Domicile, Country

LYCOURGOS KYPRIANOU                123  STROVOLOS  AVENUE

STROVOLOS,  NICOSIA

CYPRUS

Le cocontractant s'engage à communiquer spontanément les modifications à la Banque.
*The contracting partner undertakes to inform the Bank, of his own accord, about any changes*

MOORE J.
M 692

Lieu et date / Place and date               Signature / Signature

Nicosia, 7 June 2001

LTSB011



**Lloyds TSB**

A

Lloyds TSB Bank plc
Geneva Branch

N° du compte/dépôt / Account No./Deposit:

Cocontractant / Contracting partner:

## Identification de l'ayant droit économique
(Formulaire A selon art. 3 et 4 CDB)

## Establishment of the Beneficial Owner's Identity
(Form A as per Art. 3 and 4 CDB)

Le/la soussigné(e) déclare (indiquez par une croix ce qui convient):
The undersigned hereby declares (mark with a cross where appropriate):

☐ que le cocontractant est l'ayant droit économique des valeurs patrimoniales.
   that the contracting partner is the beneficial owner of the assets concerned.

☒ que l'ayant droit économique des valeurs patrimoniales est:
   that the beneficial owner of the assets concerned is:

Nom, Prénom (ou raison sociale) / Full name (or firm)    Adresse/Siège, Etat / Address/domicile, country

L K GLOBAL INFORMATION          MOSSENBRODE 6-8

SYSTEMS BV                      1109 PR

                                AMSTERDAM

                                NETHERLANDS

Le cocontractant s'engage à communiquer spontanément les modifications à la Banque.
The contracting partner undertakes to inform the Bank, of his own accord, about any change.

Lieu et date / Place and date                    Signature / Signature

LTSB012



# Lloyds TSB

## Liste de signatures pour sociétés
## Signatures list for companies

Lloyds TSB Bank plc
Geneva Branch

Nom/Name: AREMISSOFT (EE, ME, A) LIMITED    Compte N°/Account N°: 190551

Adresse/Address: CYPRUS    Siège social/Reg. offices: CYPRUS

| | Nom et prénom<br>Surname & First name | Date de naissance<br>Date of birth | Nationalité<br>Nationality | Signature | Ind./Cl.II.<br>Ind./Jo.int |
|---|---|---|---|---|---|
| 1 | LYCOURGOS<br>KYPRIANOU<br>JUNILE LE 14.06.2001 | 29.7.1951 | Cypriot | | Indiv. |
| 2 | MATHEWS<br>CHERIAN | 14/9/64 | Indian | | Indiv. |
| 3 | | | | | |
| 4 | | | | | |

Toutes limitations éventuelles dans les compétences des personnes autorisées à signer doivent être expressément mentionnées, faute de quoi les compétences résultant de la présente liste seront valables sans restriction.

Pour les sociétés inscrites au Registre du Commerce, le droit de signer d'un ou de plusieurs représentants en résulte par ci l'inscription au Registre, ce droit leur est expressément conféré par les personnes aptes à engager la société et signant le présent document.

Pour les sociétés dont le droit de signature ne résulte pas d'une inscription dans un Registre du Commerce officiel, le droit de signature du représentant, respectivement des personnes aptes à engager la société en vertu des statuts et d'une décision du Conseil d'Administration.

Tous les signataires, y compris les représentants (art. 32 CO) nommés valablement par les personnes habilitées à engager la société, sont expressément autorisés à encaisser des engagements de change, à remettre ou à rendre au nom des titres et autres valeurs déposés ou en compte de la société ou d'un tiers à son décharge pour leur propre compte, ainsi qu'à faire remettre toute correspondance et tous documents valablement quittancés à la banque et à agir, d'une façon générale et de la même manière que les personnes autorisées légales sont, stipulairement par leur décision du Conseil d'Administration, à engager la société.

Les signatures figurant sur cette présente liste sont valables aussi longtemps que les statuts n'ont pas reçu l'avis écrit de leur révocation, indépendamment d'une publication.

En cas de location d'un compartiment de coffre-fort par la société, selon contrat approprié, toutes seront autorisées à disposer du compartiment les personnes se désignant expressément à cet effet, celles qui sont signalées.

L'entraide des rapports commerciaux entre les clients et la banque est régie par les Conditions Générales de la banque, signées par les organes de la société et qui sont applicables à tous les autres signataires du compte.

L'authenticité et la validité des signatures figurant sur la présente liste, ainsi que l'existence des compétences qu'elles impliquent, sont garanties par les signataires ci-dessous.

Any possible restrictions to the powers of their persons authorized to sign must be expressly mentioned, failing which the powers conferred by this document will be considered to be valid without limitation.

In the case of Companies registered in a Commercial Register, the right of signature of one or more representatives is self-evident from the entry in the Register, this right is hereby expressly conferred upon them, by the persons who have signed this form and who, themselves are entitled by law to commit the company.

In the case of Companies whose signature right is not related to an entry in any official Commercial Register, the right to sign is hereby expressly conferred, upon all the persons shown on the list above by the 1st who have signed this form on behalf of the company, duly and legally entitled to do so by virtue of the statutes and a resolution of the Board of Directors.

All the signatories, including the representatives (art. 32 CO) validly appointed by the persons legally entitled to commit the company, are expressly authorized to exercise all their signature via the bank, to contract loans, to sell or to pledge securities of any other of the company's assets to stand with the bank, for the account of the company or a third party or a for their personal account, furthermore they are authorized to collect and to receive all correspondence and statements and to give valid discharge to the Bank, and generally speaking to perform in the same way as the persons legally authorized to commit the company by virtue of the statutes and for a resolution of the Board of Directors.

The signatures shown on the list here above will remain in force until such time as written notice revoking them has been received by the Bank, independent of any divergent entries that may appear in a Commercial Register or in any other official publication.

In the company should wish to rent a private safe under separate contract, only those persons expressly designated within that contract will be authorized to have access to the safe.

All types of banking relationship between the customer and the Bank are governed by the General Conditions, which are signed by the officers of the company and are binding on any other signatory on the account.

The authenticity and the validity of the signatures shown on the above list, and the powers they imply, are guaranteed by the undersigned.

Nicosia, le/the 7 June 2001    Signatures/Signatures

Nombre de signatures sur ce document: Two (2)

LTSB013



AREMISSOFT (EE, ME, A) LIMITED  190551

Réservé à la Banque/For Bank use only

Compte ouvert par/Account opened by: Joe Moore

Signature:

MOORE J.
M 892

EMBEDOKLIS E.
E 114

LTSB014